UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------x
                         :
PHENG VUONG a/k/a FRANK P.      :
VUONG,                           :

                   Plaintiff,  :        03 Civ. 1075 (TPG)
                          :
      - against -          :        **OPINION**
                          :
                          :
NEW YORK LIFE INSURANCE       :
COMPANY,                     :
                          :
            Defendant.  :
                          :
------------------------------------------x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/6/09
```

       Plaintiff Pheng Vuong, a/k/a Frank Vuong, brings this action against his former employer defendant New York Life Insurance Company under (1) Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., (2) 42 U.S.C. § 1981, (3) the California Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code § 12900 et seq., and (4) the New York City Human Rights Law, Administrative Code Section 8-107. New York Life moves for summary judgment dismissing the entire action.

The Issues

       Plaintiff claims that New York Life discriminated against him on the basis of his race (Asian) and national origin (Chinese) in the following respects:

1. the decision in January 1998 to appoint him co-Managing Partner, rather than sole Managing Partner, of the San Francisco General Office ("SFGO");

2. the failure to promote him to sole Managing Partner of the SFGO after he had been co-Managing Partner of the SFGO for three years, as he asserts he was promised;

3. his termination from the position of co-Managing Partner of the SFGO in December 2001;

4. the subsequent failure in 2002 to promote him to Managing Partner in another New York Life Office, particularly the Oregon and San Jose offices;

5. the decision in February 1998 to allocate a lesser percentage of the SFGO's performance-related compensation to him than his co-Managing Partner and the compensation subsequently paid to him based on that allocation.

Plaintiff also asserts that the misconduct alleged in Items (2), (3), and (4) was not only discriminatory, but was also carried out in retaliation for complaints he had made about New York Life's discriminatory treatment.

New York Life argues that the statute of limitations bars plaintiff's Title VII, section 1981, and FEHA claims with respect to the misconduct alleged in Items (1) and (5) above. New York Life also asserts that plaintiff's claims under the New York City Human Rights Law are barred, because that statute covers only discriminatory conduct occurring within New York City. Finally, New York Life claims that it is entitled to summary judgment on the merits with respect to plaintiff's remaining claims.

The motion for summary judgment is granted, and the action is dismissed.

**FACTS**

Defendant New York Life is primarily a life insurance company that markets and sells insurance and annuity products to policyholders. Each of New York Life's General Offices is led by a Managing Partner or co-Managing partners, and includes one or more Partners, Senior Partners, or Sales Managers that make up the General Office management team.   New York Life's products are sold and marketed through Agents, who are recruited by the members of the management of a General Office.

Plaintiff, who is Chinese, began working for New York Life in 1981 as an Agent with the Golden Gate Office in California.  In 1987, he was promoted to the position of Sales Manager.  In 1989, the Golden Gate Office was combined with the San Francisco General Office, and Michael Kroplin, a Caucasian, was appointed General Manager (now referred to as Managing Partner).   Plaintiff was promoted to Associate General Manager (now referred to as Partner or Senior Partner) of this newly merged office (referred to as the San Francisco General Office "SFGO") in 1989.  Based on production figures, number of agents, and size of sales territory, the SFGO is classified as a premier group 1 New York Life office, meaning it is within the top 25% of all New York Life offices nationwide.  By contrast, group 2, 3 and 4 offices are smaller, and fall

within the 26th-50th, 51st-75th, and 76th-100th percentiles, respectively.  In 1997, the SFGO was considered the top ranked New York Life Office in the Pacific zone.[1]

Plaintiff alleges, but New York Life denies, that in 1995, while attending a zone meeting in Lake Tahoe, Michael Keone, who is Hawaiian and was then the Zone Senior Vice President, told plaintiff that he could not be promoted to Managing Partner, because he only recruited Asian agents.  Plaintiff asserts that Keone said that he did not want to see the SFGO become a Chinatown.

In November 1997, plaintiff learned that Kroplin would succeed Keone as Zone Senior Vice President, and therefore the Managing Partner position in the SFGO would become available.  Phillip Hildebrand, the Senior Vice-President in charge of Agency, and Kroplin were responsible for determining the new Managing Partner of the SFGO.  Plaintiff asserts that Kroplin initially told him to draw up a plan to split the SFGO into two offices, one which would be an Asian office that plaintiff would manage, and the other, a Caucasian office.  Kroplin does not recall having this conversation.  Hildebrand testified at his deposition that Kroplin gave him options as to how to approach the SFGO vacancy, which included the possibility of dividing the office.  But Hildebrand asserts that "it was never narrowed down to Mike Kroplin recommending" that the SFGO be split.

---

[1] The New York Life organization is divided into geographic zones, with the Pacific zone being relevant to the instant action.

Hildebrand and Kroplin both testified in depositions that they considered plaintiff for the position of sole Managing Partner of the SFGO, but felt that he was somewhat lacking in qualifications and experience. This led them to decide to implement a co-Managing Partner arrangement, and they selected John DeBuono, a Caucasian, to act in that position with plaintiff. John DeBuono had been the Managing Partner of other offices, and was then serving as a Zone Vice President for the Pacific zone.

Plaintiff states that he raised concerns about the co-Managing Partner structure in a telephone call with Hildebrand, but Hildebrand responded that it was better for someone from the zone level to help plaintiff run an office as large as the SFGO. Plaintiff asserts that Hildebrand's decision was motivated by racial bias, because in the Dallas New York Life Office, a junior partner was promoted to Managing Partner, and a person from the zone or home office was brought in only temporarily for three years to help the junior partner transition to management. Hildebrand testified that in Dallas he explicitly promised the co-Managing Partners that "the person that had the best performance would end up with Dallas and the other would be offered another office," but no such agreement was made in connection with the SFGO.

On January 5, 1998, plaintiff and DeBuono were officially promoted as co-Managing Partners of the SFGO. Plaintiff alleges that

Kroplin assured him that the co-Managing Partner arrangement was only temporary, and it was to plaintiff's benefit to manage the office with the help of someone from the zone office "for the first three years," then "take the office as a whole." Kroplin does not confirm this conversation, and Hildebrand denies ever having a conversation with plaintiff where he indicated that if plaintiff excelled at the SFGO, DeBuono would be removed and plaintiff would manage the entire office alone.

Managing Partners are responsible for the overall performance of their General Offices. Accordingly, New York Life allocates to each Managing Partner a percentage of his General Office's performance-related compensation, so that the Managing Partner's compensation is based, in part, upon the yearly performance of his office. Because plaintiff and DeBuono were both Managing Partners in the SFGO, the SFGO's performance-related compensation was split between them. In February 1998, New York Life made the decision to allocate a greater percentage of the SFGO's performance-related compensation to DeBuono than plaintiff. This allocation split did not change during plaintiff's employment as co-Managing Partner.

Hildebrand testified in his deposition that he explained to both DeBuono and plaintiff that the SFGO's performance-related compensation would be allocated between them, in part, based on their compensation at the time of promotion. It is uncontested that prior to his promotion to co-Managing Partner of the SFGO, DeBuono earned

more money than plaintiff at New York Life.   Therefore, DeBuono received a greater percentage of the SFGO's performance-related compensation than plaintiff, because of his prior compensation and his prior work history at the company.   During his tenure as co-Managing Partner, plaintiff repeatedly complained and requested that the allocation of the SFGO's performance-related compensation between him and DeBuono be recalculated as a 50/50 split.

Plaintiff also states that in February or March 2001, Hildebrand informed plaintiff that there was a position open with the company in China, to which plaintiff responded that he was not interested.

Plaintiff became dissatisfied with his situation.   While he apparently did an adequate job during his first two years as co-Managing Partner, in late 1999, he started getting "fed up."  He has testified that in 2000, he began to "sit back," and "try not to bring [his] ability up to full speed," while he waited to see what New York Life was going to give him or promise him about the future.  More specifically, plaintiff states that he began to "lay off focus on recruiting" in 2000, although that was the thing he had done most and did well.  As he stated, he was only "slowly, slowly doing recruiting."  Plaintiff also states that he began to expend less time, if any, supervising the second line managers and helping them recruit Agents.  Plaintiff concedes that while in the office around mid-2000, most of the time he was doing nothing.  Plaintiff concedes that his behavior affected the overall performance of the SFGO in 2000 and 2001,

and contributed to the office's problems reaching the objective numbers that New York Life had set for it.

Kroplin and Stephen Ray, who later succeeded Kroplin as Zone Senior Vice-President, sent several letters to plaintiff and DeBuono discussing recruiting deficiencies at the SFGO. In a letter dated August 24, 1998, addressed to both DeBuono and plaintiff, Kroplin stated that "there are several things that concern me ... the most glaring area is the lack of recruiting." Plaintiff states that this type of letter is "very normal," as recruiting always picks up in the second, third and fourth quarters. But plaintiff admits that the SFGO failed to meet its recruiting goals in 1999, finishing with 32 full-time appointments, rather than the target 56.

Later, in two identical letters dated April 28, 2000, addressed separately to DeBuono and plaintiff, Ray stated that "I know that you realize how important it is to build an agency through quality recruiting, but looking at the number of full-time appointments and recruiting activity through the first quarter of 2000, I question if you are making this a high priority." Plaintiff concedes that Ray's criticism was warranted, because he was "fed up" at this point, which affected his performance.

In two separate letters dated February 23, 2001, from Ray to DeBuono and plaintiff, Ray underscored again that during each of their tenures as co-Managing Partner over the past three years, the SFGO "has

missed its recruiting objective and New Organization First Year Commissions continues to decline." Ray then set out identical targets for DeBuono and plaintiff to achieve by June 30, 2001. However, in a letter to plaintiff dated July 30, 2001, Ray stated that plaintiff fell short on all these objectives. Ray offered plaintiff one final opportunity to demonstrate significant improvement by setting out three more objectives to be met by December 31, 2001. Ray explicitly wrote that "in the event you fail to achieve the stated objectives by December 31, 2001, your contract as Managing Partner of the San Francisco General Office will be terminated."

Shortly thereafter, plaintiff received a performance summary covering the period of January 2, 2001 through June 30, 2001, in which he received an "unacceptable" rating. Plaintiff concedes that this rating was warranted based on the objective numbers of the performance summary. DeBuono received an identical letter with the same unacceptable rating.

In or around November 2001, it became clear that plaintiff and DeBuono were not going to meet the targets that Ray had set for the SFGO. Accordingly, New York Life advised both plaintiff and DeBuono that they would be terminated from the position of co-Managing Partner effective December 31, 2001 if they did not resign. Hildebrand explained to plaintiff that if he elected to resign, when a Managing Partner position in another office became available, he would be eligible for promotion.

But if he did not resign and was terminated after missing the stated objectives, he would not be "promotable" to Managing Partner of another office. Both DeBuono and plaintiff resigned as Managing Partner effective December 31, 2001.

New York Life decided that because the co-Managing Partner arrangement had been ineffective in the SFGO, it would return to a sole Managing Partner arrangement in filling the SFGO vacancy. After offering the sole Managing Partner position to two Caucasians who declined, the company replaced plaintiff and DeBuono with K.B. Sareen, an Asian. Plaintiff asserts that Sareen was willing to have him as a Partner in the SFGO. Sareen, however, testified that his only conversation with plaintiff on that subject was when plaintiff joked that he would be "very good working here as a partner." Sareen states that he "didn't take it seriously." While Hildebrand testified that Sareen informed Ray that he "would be open" to keeping plaintiff in the SFGO, Hildebrand further explained that New York Life makes it a practice not to retain demoted employees in the same general office, because when it has done so in the past, "the new manager coming in has to contend with a disgruntled manager that was in that office as well."

Following plaintiff's decision to resign, Ray and Hildebrand informed plaintiff that he would be on the waitlist for five months from December 31, 2001, to be considered for another Managing Partner position. That would be until May 2002. Hildebrand also decided that

during this time, both DeBuono and plaintiff would be given priority to take a Managing Partner position in any group 2, group 3, or group 4 General Office that became available.

Plaintiff states that Hildebrand made this offer, because New York Life had already been sued by other Asian managers for discrimination, and the company wanted to avoid any negative impact on the Chinese market.  Sally Mak, the Chinese manager for the New York Life home office responsible for Chinese market development, did write an email, which was forwarded to Ray and Hildebrand on December 5, 2001, stating that plaintiff's resignation "will inevitably send a message to and create an impact on our Chinese market," because plaintiff "has been perceived as 'the Big Brother' by our market managers and agents and many of them look up to him for advice."  Mak therefore recommended that "it would be desirable to see a transition that is as smooth as possible so that our [New York Life's] current stability of the Chinese field force will not be upset to a great extent."

Plaintiff claims that he was discriminated against when New York Life failed to appoint him as Managing Partner of either the Oregon or San Jose office.  The evidence is as follows.

When the Chief Operating Officer position for the Pacific zone became vacant, Ray spoke with both plaintiff and DeBuono about their interests.  While plaintiff told Ray that "he had absolutely no interest in considering working for the zone in that capacity," DeBuono indicated he

was interested, and was eventually offered the position. When a position in the Columbus, Ohio office opened up in December 2001, Hildebrand told Ray that he should offer the position to plaintiff as promised. Plaintiff, however, turned the position down. In an email to Ray on December 17, 2001, plaintiff wrote that he would only "accept positions in the San Francisco Bay Area."

Later, a Managing Partner position opened in the Greater Oregon Office. Ray testified that he left plaintiff a voicemail on April 19, 2001 about the position, but plaintiff denies ever receiving this message. On April 22, 2002, Ray reached plaintiff on his cell phone and offered him the position. Plaintiff responded that he was leaving that evening for China, because his father-in-law was in critical condition. Ray told plaintiff that he would have to make a decision quickly, because the office needed to be filled. Ray then faxed information about the office to plaintiff. Ray asserts that they then agreed that plaintiff would give Ray an answer by April 26, 2002, four days after the phone call. But plaintiff asserts that he only needed to express interest by this date. Ray testified that if plaintiff had accepted, he would have "absolutely" gotten the office. On April 26, 2002, plaintiff called the Pacific zone long distance from Macau, and spoke with DeBuono. He told DeBuono to inform Ray that he was interested in the Greater Oregon office, but that he needed more time. Plaintiff wanted to know the base compensation and guarantees that the position included. Plaintiff states that he also said

"you got to let me go there and evaluate the place before I officially accept it." Plaintiff also left Ray a voice mail on April 26, 2002, reiterating his conversation with DeBuono.

Plaintiff concedes that he understood New York Life's procedure for offers. New York Life would make an offer to the first candidate, allow him three days to respond, and if he showed no interest, New York Life would then move on to the second person on the list. Accordingly, when Ray did not receive an acceptance from plaintiff by April 26, 2002, he took plaintiff out of consideration for the Greater Oregon position. Ray later instructed his staff person Joan Tesio to inform plaintiff of this by email. It is uncontested that on May 6, 2002, New York Life hired a Caucasian to fill the Managing Partner position in the Greater Oregon General Office.

Plaintiff states that he wanted the Managing Partner position in the San Jose General Office. The position became vacant officially on July 1, 2002. Plaintiff's five month period of eligibility on the waitlist for a Managing Partner position, however, expired in May 2002 (five months after his resignation on December 31, 2001). Ray states that plaintiff was ineligible for the San Jose position, as at that time, it was a group 1 office.[2] Plaintiff testified that at the time of his resignation, Hildebrand told him that in the next quarter, New York Life would have a potential office open in his area, and plaintiff understood this to reference the San

---

[2] It is uncontested that until 2000, the San Jose General Office had been a group 2 office.

Jose Office. It is uncontested that New York Life hired a Caucasian to fill the position of Managing Partner of the San Jose General Office.

## DISCUSSION

On a motion for summary judgment, the non-moving party is required to go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. Holcomb v. Iona College, 521 F.3d 130, 137 (2d Cir. 2008). In evaluating the record to determine whether a genuine issue exists as to any material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought. Id. Where an employer is alleged to have acted with discriminatory intent, direct evidence of intent will rarely be available. Therefore, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination. Id.

### Statute of Limitations

Title VII

New York Life contends that two of plaintiff's Title VII claims are time-barred. These claims concern (1) the failure to promote plaintiff to sole Managing Partner of the SFGO, and (2) the allocation of different percentages of the SFGO's performance-related compensation to DeBuono and plaintiff.

Title VII provides that a claimant must file a charge of discrimination with the Equal Employment Opportunity Commission

("EEOC") within 180 days "after the alleged unlawful employment practice occurred," unless the "person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice," in which case the claimant has 300 days to file his charge with the EEOC. See 42 U.S.C. § 2000e-5(e)(1).

However, the EEOC and California's Department of Fair Employment and Housing are parties to a work-sharing agreement, whereby a charge filed with the EEOC will automatically be deemed filed with the Department of Fair Employment and Housing. See Rodriguez v. Airborne Express, 265 F.3d 890, 901 n.9 (9th Cir. 2001). In such a case, the charge will be deemed "initially instituted" with the state agency within the meaning of Title VII. See Tewksbury v. Ottaway Newspapers, 192 F.3d 322, 325-28 (2d Cir. 1999). Therefore, a claim filed with the EEOC—because it is automatically deemed filed with the Department of Fair Employment and Housing as well—automatically extends the claimants time to file to 300 days.

Plaintiff filed a charge with the EEOC in California on August 2, 2002. The parties agree that, as a result, the 300 day time period applies, and any alleged unlawful employment practice in this case that occurred prior to October 3, 2001 (300 days prior to the date of filing) is time-barred. The period within which the claimant may timely file (here, 300 days, though in other cases 180 days), is called the "charging period."

National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 109-110 (2002), was one of the cases in which the Supreme Court dealt with the time when an "employment practice" occurs for purposes of Title VII's limitation on filing a charge with the EEOC. The Court listed certain practices which it characterized as "discrete" acts, such as (1) failure to promote, (2) termination, (3) denial of transfer, and (4) refusal to hire, and which unsurprisingly occur on the day that they happen, rather than extending into some future time. Id. at 110. The Court, however, also recognized that "there may be circumstances where it will be difficult to determine when the time period should begin to run. One issue that may arise in such circumstances is whether the time begins to run when the injury occurs as opposed to when the injury reasonably should have been discovered." Id. at 114 n.7. Indeed, there are circumstances where a plaintiff is unaware for some time that his employer acted with discriminatory intent in taking an adverse employment action. When this occurs, the Second Circuit has held that a claim of employment discrimination accrues for statute of limitations purposes from the date the employee "knows or has reason to know of the injury which is the basis of his action." Cornwell v. Robinson, 23 F.3d 694, 703 (2d Cir. 1994); Braxton v. Erie County Dist. Attorney, No. 06 Civ. 311A, 2008 WL 4426021, at *5 (W.D.N.Y. Sept. 25, 2008).

Focusing first on plaintiff's promotion claim, an analysis of plaintiff's complaint and his arguments on this motion indicate that

there may be two claims of discrimination regarding New York Life's failure to promote plaintiff to the sole Managing Partner position in the SFGO. Plaintiff appears to make a claim based on the January 1998 decision to make him co-Managing Partner rather than sole Managing Partner. Plaintiff also claims that he was assured by Kroplin that the co-Managing Partner arrangement was only temporary, that DeBuono would be removed after plaintiff had been co-Managing Partner of the SFGO for three years, and that he was discriminated against by the failure to honor these assurances.

It is clear that New York Life committed a "discrete" act in January 1998 when it promoted plaintiff and DeBuono to be co-Managing Partners of the SFGO, rather than promoting plaintiff to be sole Managing Partner. Of course, plaintiff knew what was occurring at that time. This was more than 300 days before plaintiff filed with the EEOC on August 2, 2002, and any claim of wrongdoing at that time is time-barred.

It is necessary also to deal with plaintiff's claim that the co-Managing Partner arrangement was only temporary. Plaintiff specifically claims to have been assured that DeBuono would be removed after three years. This three year period expired in January 2001. Since at that time, DeBuono had not been removed, and plaintiff had not been made sole Managing Partner (all of which he, of course, knew), it would seem that plaintiff's cause of action for failure to honor the assurances would

have accrued as of approximately January 2001, which was many months before the charging period started on October 3, 2001. However, plaintiff claims that he did not know about the failure to keep the commitment to make him sole Managing Partner until November 2001, when he was told he could either resign or be terminated as co-Managing Partner. But it is impossible to believe that, after the three-year period had elapsed, and no mention had been made or was being made to plaintiff about changing his status to sole Managing Partner, plaintiff held any belief that the alleged commitment was still alive. This Court concludes, based on the uncontradicted record, that plaintiff knew, or at the very least had reason to know, that any alleged assurance or promise about eliminating the co-managing arrangement was dead prior to the onset of the charging period, October 3, 2001. Therefore, this claim is time-barred.

It is now necessary to turn to plaintiff's claim that the allocation of different percentages of the SFGO's performance-related compensation between plaintiff and DeBuono was discriminatory.

The issue of when the unlawful employment practice occurs with respect to compensation is the subject of legislation, which became effective only a few days ago, and which in effect overturned the Supreme Court decision in Ledbetter v. Goodyear Tire & Rubber Co., 127 S. Ct. 2162 (2007).

By way of background, the <u>Ledbetter</u> decision will be briefly summarized.  In that case, the Court held that a claimant alleging discrimination based on a pay-setting decision must file a charge with the EEOC within 180 days, or 300 days, after the discriminatory decision was made.  <u>Id</u>. at 2165, 2169.  The Court rejected the plaintiff's claim that she could recover based on a later paycheck she received that would have been larger had the prior discrimination not occurred.  <u>Id</u>. at 2167. The plaintiff conceded that there was no discriminatory intent by the personnel involved in issuing the later paychecks.  <u>Id</u>.  The Court ruled that the continuing effects of a past employment decision, which was adopted with discriminatory intent, do not transform a subsequent employment act, unaccompanied by discriminatory intent, into a present violation.  <u>Id</u>. at 2167-70.

However, the <u>Ledbetter</u> decision prompted Congress to pass the "Lilly Ledbetter Fair Pay Act of 2009," which became law on January 29, 2009.  Pub. L. No. 111-2, 123 Stat. 5.  This Act amends Title VII by adding the following provision to 42 U.S.C. § 2000e-5(e);

> For purposes of this section, an unlawful employment practice occurs, with respect to discrimination in compensation in violation of this title, when a discriminatory compensation decision or other practice is adopted, when an individual becomes subject to a discriminatory compensation decision or other practice, or when an individual is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice.

The Act was to "take effect as if enacted on May 28, 2007," and is to "apply to all claims of discrimination in compensation under title VII ... that are pending on or after that date."  Therefore, the new statutory provision clearly governs the compensation claim in the instant case.

In the present case, the decision regarding the allocation was made by New York Life in February 1998.  Plaintiff claims that this decision resulted from wrongful discrimination between him and DeBuono. Thereafter, compensation payments were made based on the February 1998 formula.  Presumably, plaintiff was paid monthly, so that after the commencement of the charging period (October 3, 2001), plaintiff received three paychecks - at the end of October, November, and December.

The defense originally relied on <u>Ledbetter</u> in arguing that the discriminatory decision of February 1998, which was made long before the onset of the charging period, could not be the basis of a claim based on compensation payments made within the charging period.  However, this argument is foreclosed by the new legislation.

Plaintiff claims that the paychecks he received during the charging period would have been larger if New York Life had not made the discriminatory decision in February 1998 to allocate a lesser percentage of the SFGO's performance-related compensation to him than his co-Managing Partner.  This type of claim is expressly declared to be timely by virtue of the recently enacted law.

Section 1981

New York Life also contends that the promotion and compensation claims, asserted under 42 U.S.C. § 1981, are time-barred.

Claims brought under section 1981 can be subject either to a four-year statute of limitations or the statute of limitations of the applicable state. Pursuant to 28 U.S.C. § 1658, passed on December 1, 1990, Congress prescribed a four-year statute of limitations for federal laws that do not specify a limitation period and were enacted after December 1, 1990. Congress amended section 1981 in the Civil Rights Act of 1991. The Supreme Court has therefore held that where a section 1981 claim could not have been brought prior to the Civil Rights Act of 1991, the claim is now governed by the four year statute of limitations established by 28 U.S.C. § 1658. Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 382-83 (2004).

As originally enacted, section 1981 only permitted plaintiffs to bring employment discrimination claims when the discrimination occurred in the making and enforcement of contracts, as opposed "to problems that may arise later from the conditions of continuing employment." Patterson v. McLean Credit Union, 491 U.S. 164, 176-77 (1989). It was not until 1991 that Congress amended section 1981 to permit plaintiffs to bring claims of racial discrimination in connection with employment conditions.

Both of plaintiff's claims concerning the failure to promote him to sole Managing Partner are governed by the four year limitations period. Under the original language of section 1981, a promotion claim was only actionable "where the promotion rises to the level of an opportunity for a new and distinct relation between the employee and the employer." Id. at 185.   Here, plaintiff's promotion claims concern alleged adverse employment actions that occurred during the performance of an existing employment relationship.  Plaintiff's promotion to sole Managing Partner would not have created a new relationship between plaintiff and New York Life, distinct from his existing employment relationship.   See Hawkins v. 1115 Legal Service Care, 163 F.3d 684, 693-94 (2d Cir. 1998) (promotion of a staff attorney to position of Senior Attorney "would not have created a new and distinct relationship between" employer and employee).   Plaintiff's promotion claims are therefore only actionable under the 1991 amendments to section 1981, and the four year statute of limitations applies.

Similarly, plaintiff's claim concerning New York Life's decision to allocate different percentages of the SFGO's performance-related compensation to him and DeBuono can be asserted only as a result of the 1991 amendments to section 1981, and therefore is subject to a four year limitations period.

Plaintiff commenced this action on February 18, 2003.  Plaintiff's promotion and compensation claims are therefore time-barred under

section 1981 if they accrued before February 18, 1999, four years prior to the date plaintiff filed his complaint.  As discussed with respect to Title VII, under federal law, a claim accrues for statute of limitations purposes when the "plaintiff knows or has reason to know of the injury which is the basis of his action."  Cornwell v. Robinson, 23 F.3d 694, 703 (2d Cir. 1994).

The first of plaintiff's promotion claims is time-barred.  It accrued in January 1998, when New York Life made plaintiff and DeBuono co-Managing Partners of the SFGO, instead of promoting plaintiff to be sole Managing Partner.

The second of plaintiff's promotion claims is not time-barred.  For purposes of this summary judgment motion, this Court will treat this claim as accruing sometime in 2001, when New York Life, according to plaintiff, failed to keep its commitment to make plaintiff sole Managing Partner after he had been co-Managing Partner for three years.

Finally, it is necessary to determine the timeliness of plaintiff's claim related to the February 1998 decision about compensation allocation.  Again, the accrual of the cause of action is when the plaintiff knows or has reason to know of the injury.  The decision regarding the allocation between plaintiff and DeBuono was made in February 1998. Plaintiff asserts that he was unaware that the allocation decision was a departure from typical policy, so he did not object to the split for 1998. But he raised objections to the allocation beginning at the end of that

year.   His objections were obviously to the fact that he was treated differently than DeBuono.   Thus, the latest time that can be assigned to the accrual of the compensation claim is the end of 1998, more than four years prior to the commencement of the present action.   The compensation claim under section 1981 is therefore time-barred.

FEHA

New York Life additionally contends that plaintiff's promotion and compensation claims are time-barred under FEHA.

Before bringing a civil action under FEHA, a plaintiff must exhaust his administrative remedies by filing a complaint with California's Department of Fair Employment and Housing within one year from the date upon which the alleged unlawful action occurred.   See Cal. Gov't. Code § 12960(d).   The statute provides four exceptions.   The only exception that could apply to plaintiff's claims is a maximum 90-day extension past the one year when a plaintiff first becomes aware of the facts of an alleged unlawful practice after the expiration of the limitation period.   Id. § 12960(d)(1).

As previously addressed, plaintiff filed his EEOC charge of discrimination in California on August 2, 2002, and pursuant to a work-sharing agreement between the EEOC and California's Department of Fair Employment and Housing, the charge was deemed filed with the Department of Fair Employment and Housing on the same date.   In order

to have filed his complaint within the prescribed one year limitation period, plaintiff's claims must have accrued on or after August 2, 2001.

Even if the statutory 90-day extension applied in this case, plaintiff's claims regarding New York Life's decisions (1) to promote plaintiff to co-Managing Partner, rather than sole Managing Partner, and (2) to allocate different percentages of the SFGO's performance-related compensation to DeBuono and plaintiff, both accrued in 1998, as addressed earlier. These claims are therefore clearly time-barred under FEHA. In addition, plaintiff's claim that he was assured that the co-Managing Partner arrangement was only temporary accrued in January 2001, or at least before August 2, 2001. This claim is therefore also time-barred under FEHA, even if the 90-day extension applied.

### Timely Claims

While a number of plaintiff's claims discussed above are time-barred under Title VII, Section 1981, and FEHA, several timely claims remain.

(a)  This Court has ruled that plaintiff's section 1981 claim concerning New York Life's failure to keep its promise to promote him to sole Managing Partner after he had been co-Managing Partner for three years is timely.

(b)  Plaintiff also makes the claim, never challenged as untimely, that he was wrongfully terminated from his position as

co-Managing Partner in December 2001. This claim is made under Title VII, section 1981, and FEHA.

(c)    This Court has ruled that plaintiff's Title VII claim regarding the allocation of different percentages of the SFGO's performance-related compensation to himself and DeBuono is timely.

(d)    Plaintiff also makes a claim, never objected to as untimely, that he was wrongfully denied promotion to Managing Partner of another New York Life Office in 2002, following his resignation from the SFGO. This claim is brought under Title VII, section 1981, and FEHA.

(e)    Finally, plaintiff claims that certain of the adverse employment actions were taken in retaliation against plaintiff for the complaints of discrimination he made to New York Life. The retaliation claims will be described in detail later in this opinion. There has been no contention that the retaliation claims are time-barred.

These timely claims will now be discussed on their merits. They will all be analyzed under the "mixed-motive" framework. The Supreme Court established the mixed motive principle in Price Waterhouse v. Hopkins, 490 U.S. 228, 247-58 (1989), where it held that a plaintiff was not required to prove that a prohibited discriminatory factor was the sole reason for a challenged employment decision to establish liability.  In

1991, Congress amended Title VII to read that "an unlawful employment practice is established when the complaining party demonstrates that race . . . was a motivating factor for any employment practice, even though other factors also motivated the practice."  42 U.S.C. § 2000e-2(m).   A plaintiff can therefore avoid summary judgment in an employment discrimination case if he can show a triable issue as to whether a prohibited factor played at least a motivating part in a challenged employment decision.   Holcomb v. Iona College, 521 F.3d 130, 138 (2d Cir. 2008).

While the "mixed motive" principle applied in Price Waterhouse dealt with the claim of gender discrimination under Title VII, it would appear clear that this principle applies to section 1981 cases as well. See Staff v. Pall Corp., 76 Fed. Appx. 366, 368 (2d Cir. 2003); Gant v. Wallingford Bd. of Educ., 195 F.3d 134, 146 n.16 (2d Cir. 1999). Similarly, the Ninth Circuit has stated that "California courts apply the Title VII framework to claims brought under FEHA." Metoyer v. Chassman, 504 F.3d 919, 941 (9th Cir. 2007).

Plaintiff is not required to present direct evidence of discrimination to establish his mixed motive case.  Holcomb v. Iona College, 521 F.3d 130, 141 n.3 (2008).   Rather, plaintiff may rely on circumstantial evidence, so long as it is linked directly to the discriminatory animus complained of in the action.  Ostrowski v. Atlantic Mut. Ins. Cos., 968 F.2d 171, 182 (2d Cir. 1992).  Indeed, to state a mixed motive case, a

plaintiff must provide a "smoking gun or at least a thick cloud of smoke to support his allegations of discriminatory treatment." Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 174 (2d Cir. 2006). Finally, in a mixed motive case, a plaintiff is not required to prove that the defendant's professed lawful explanation for its employment decision was a pretext. Holcomb, 521 F.3d at 142.

## 2001 Promotion and Termination Claims

It is not often that an employment discrimination claim is undermined so conclusively by the undisputed facts about the plaintiff's own performance. In this case, plaintiff has admitted, in the most vivid terms, his dereliction from carrying out the managerial responsibilities entrusted to him. He has testified that in late 1999, he became "fed up," and that in 2000, he began to "sit back" and consciously fail to use his "ability up to full speed." Although one of his main duties as a manager was recruiting, he began to "lay off focus on recruiting," and to do the recruiting "slowly, slowly." Plaintiff admits that he expended little time at this juncture supervising the second line managers under him. His testimony goes so far as to concede that, while in the office around mid-2000, most of the time he was doing nothing. He admits that this sub-standard performance occurred in both 2000 and 2001, and contributed to his office's problems reaching the objectives that New York Life had set for it. Remedial efforts by plaintiff's superiors were unavailing.

Under these circumstances, it is hardly surprising that New York Life failed to make him the sole Managing Partner in the SFGO, and ultimately, asked for his resignation.  There is no basis whatever for any claim that New York Life discriminated against plaintiff in these employment decisions on the basis of his race or national origin.  There is no issue of fact to be tried.

2002 Promotion Claim

In an act of what can only be called generosity, New York Life considered plaintiff for Managing Partner positions in various offices, other than San Francisco, following his resignation there.

Hildebrand decided that both DeBuono and plaintiff would be given priority to receive offers for Managing Partner positions in any group 2, group 3, or group 4 General Office that became available before May 2002.  New York Life first spoke with plaintiff about an opening in the position of Chief Operating Officer for the Pacific zone, but plaintiff indicated he had no interest.  Similarly, when New York Life offered plaintiff the Managing Partner position in Columbus, Ohio, plaintiff also declined.

Plaintiff claims that he was discriminated against in connection with the Greater Oregon Managing Partner position.  Indeed, New York Life offered this position to plaintiff.  The problem arose when plaintiff traveled to China and delayed accepting this offer, resulting in its revocation.  There is a dispute as to the precise details of what went on,

but there is no evidence whatever to support a claim that the withdrawal of the offer for the Oregon office resulted, even in part, from unlawful discrimination.

Finally, plaintiff complains about not obtaining the Managing Partner position in San Jose. This position became vacant on July 1, 2002, and at this time, it was a group 1 office. It was not offered to plaintiff. When plaintiff resigned from San Francisco, he was told that he would be eligible to be considered for Managing Partner positions in group 2, group 3, or group 4 offices that became available before May 2002. The San Jose office did not come within this specification. There is no evidence that unlawful discrimination played any part in New York Life's treatment of plaintiff as it may have related to San Jose.

Retaliation Claim

Plaintiff asserts that in retaliation for complaints he made to New York Life about discriminatory treatment, (1) he was denied promotion to sole Managing Partner of the SFGO after he had been co-Managing Partner of the office for three years, (2) he was terminated from his position as co-Managing Partner in 2001, and (3) New York Life refused to promote him to Managing Partner in another New York Life office in 2002.

What has been said earlier in this opinion about these claims is sufficient to negate conclusively the claim of retaliation. This is evident beyond any question, and requires no elaboration.

Compensation Claim

Plaintiff asserts that the allocation of a greater percentage of the SFGO's performance-related compensation to DeBuono than to plaintiff was discriminatory, and should have been recalculated so that he and DeBuono received an equal share.

It is uncontested that as a Zone Vice President for the Pacific zone, prior to his promotion to the SFGO, DeBuono earned more than plaintiff, who was then a senior partner at the SFGO.  Indeed, plaintiff does not attribute any discriminatory motive to this pay differential.  It is also uncontested that, unlike plaintiff, DeBuono had been the Managing Partner of other New York Life offices prior to his promotion to co-Managing Partner of the SFGO.  Based on this prior work history and compensation, New York Life decided to allocate to DeBuono a greater percentage of the SFGO's performance-related compensation than to plaintiff.  There is no evidence that discriminatory animus played any role in this allocation decision or in the fact that New York Life did not recalculate this split in response to plaintiff's complaints.  Indeed, what has been said earlier in this opinion about plaintiff's poor performance in 2000 and 2001 shows that he surely had no basis for demanding recalculation to give him a greater percentage allocation.  There is therefore no issue of fact to be tried on plaintiff's compensation claim.

New York City Human Rights Law Claims

Plaintiff additionally alleges claims under the New York City Human Rights Law, Administrative Code Section 8-107 ("NYCHRL"), which New York Life argues should be barred. The NYCHRL covers only discriminatory conduct occurring within the city limits. Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC, 470 F. Supp.2d 345, 362 (S.D.N.Y. 2007)(citing Admin. Code City N.Y. §§ 2-201, 8-101). Indeed, the site of impact is the determinative fact, rather than the place where the discrimination originated. Id. In the instant action, the impact of the purported acts of discrimination was solely in California. Plaintiff worked exclusively in New York Life's California office, and therefore any of the alleged discrimination could only have had its impact on him in California. Accordingly, plaintiff's claims under the NYCHRL must be dismissed.

## CONCLUSION

Defendant's motion for summary judgment is granted in its entirety and the action is dismissed.

Dated: New York, New York
       February 6, 2009

SO ORDERED

Thomas P. Griesa
U.S.D.J.